UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

KEITH P. BATT,

           Plaintiff,

   v.

CITY OF OAKLAND, OAKLAND POLICE DEPARTMENT, and DOES 1–20,

           Defendants.

No. C 02-04975 MHP

**MEMORANDUM & ORDER**
**Re: Motion for Summary Judgment**

      Plaintiff Keith Batt filed this action, alleging federal civil rights violations and state law torts in connection with his employment by defendant Oakland Police Department ("OPD"). Now before the court is defendants' motion for summary judgment. Having considered the parties' arguments and submissions, and for the reasons set forth below, the court enters the following memorandum and order.

BACKGROUND

      The court reviewed the factual history of this case in some detail in its order on defendants' motion for judgment on the pleadings, and need not repeat the full history here. For purposes of resolving the current motion, it is only necessary to review a few critical facts, which are either undisputed or are taken from plaintiff's submissions and accompanying argument.

      Plaintiff graduated from the Oakland Police Academy in June, 2000 and began work for the OPD as a trainee on June 18, 2000. Chuck Mabanag was appointed plaintiff's Field Training Officer ("FTO"). During plaintiff's two-week tenure under officer Mabanag, he witnessed

numerous illegal and brutal acts on the part of his supervising officer and three other OPD officers. The group of four officers subsequently became known as the "Riders," and were subjected to partially successful criminal prosecution. Declaration of Keith P. Batt in Opposition to Defendants' Motion for Summary Judgment or Alternatively Summary Adjudication ("Batt Dec.") ¶¶ 3–4, 21.

Mabanag told plaintiff to keep quiet about what happened within their car and to bring any problems to him or the other three members of the squad. One of the other Riders, Officer Vazquez, was similarly clear about his views on officer misconduct and reporting misconduct to superiors. Vazquez instructed plaintiff never to tell what another officer had done. He said that "[s]nitches lie in ditches" and that if plaintiff was a snitch, Vazquez would beat him. Vazquez also told plaintiff to "[f]uck probable cause. Fuck all that shit you learned in the academy . . . ." Id. ¶¶ 3–4, 7, 22.

After witnessing the Riders' unlawful acts and receiving the threat from Vazquez, plaintiff had a conversation with his former instructor, Mary Guttormson, in which he revealed that Mabanag had beaten and planted drugs on suspects. According to plaintiff, Guttormson took no action in response to plaintiff's disclosure other than to advise plaintiff to "stand up to" Mabanag, and "not to tolerate that anymore." Declaration of Bruce M. Towner in Opposition to Defendants' Motion for Summary Judgment or Alternatively Summary Adjudication ("Towner Dec."), Exh. 5 at 55–68.

After enduring several more days with the Riders, during which plaintiff witnessed more brutality and deliberate falsification of police reports, plaintiff informed Mabanag that he was going to quit because he could no longer participate in these illegal activities. Mabanag told plaintiff to speak to Vazquez. Vazquez said he respected that plaintiff was not comfortable with the acts of the Riders and that they would not do anything bad in front of him again. Plaintiff still felt he had no choice but to resign to avoid participating in or condoning illegal police actions, and was afraid to report the wrongdoing out of fear of retaliation. He resigned from the OPD on July 3, 2000. Id. at 17, 40. One to two days after his resignation, plaintiff discussed what had happened with OPD Internal Affairs. Batt Dec. ¶¶ 15–17.

Plaintiff identifies a number of pieces of evidence in support of his contentions that he feared retaliation in the event of speaking out, and that the OPD had a general culture of punishing officers

2

1  who reported misconduct. First, during his time at the academy, plaintiff heard the story of an
2  officer who had "snitched" on one of his colleagues and ruined his chances of being successful at the
3  OPD. Id. ¶ 21. Second, the "snitches in ditches" comment by Vazquez was clearly intended to
4  prevent plaintiff from reporting misconduct. Third, after he resigned, plaintiff heard that he would
5  "get his ass kicked" if he returned to the OPD, and another officer overheard a locker room
6  discussion of going to plaintiff's house to "do a special project." Virtually everyone he trained with
7  stopped talking to him. Two instructors told him not to return to work and that it would be very
8  difficult if he did. Id. ¶¶ 23–24. Fourth, Oakland Police Chief Word stated during his deposition
9  that plaintiff would have had difficulty advancing as an officer had he decided to remain with OPD
10 after reporting the Riders to internal affairs. Finally, plaintiff provides evidence that the department
11 was lax in responding to previous complaints about Mabanag, and that other officers who spoke out
12 against the Riders suffered harassment.

13    Plaintiff subsequently filed this lawsuit, alleging violations of his rights under the First and
14 Fourteenth Amendments to the United States Constitution, as well as various state law torts.
15 Defendants moved for judgment on the pleadings as to each of plaintiff's claims, which this court
16 granted in part. Defendants now move for summary judgment on plaintiff's four remaining claims,
17 for violation of plaintiff's rights under the First Amendment, constructive discharge, and intentional
18 and negligent infliction of emotional distress.

20 LEGAL STANDARD

21    Summary judgment is proper when the pleadings, discovery and affidavits show that there is
22 "no genuine issue as to any material fact and that the moving party is entitled to judgment as a
23 matter of law." Fed. R. Civ. P. 56(c). Material facts are those which may affect the outcome of the
24 case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute as to a material fact is
25 genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving
26 party. Id. The party moving for summary judgment bears the burden of identifying those portions
27 of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of

3

material fact. Celotex Corp. v. Cattrett, 477 U.S. 317, 323 (1986). On an issue for which the opposing party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." Id.

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). Mere allegations or denials do not defeat a moving party's allegations. Id.; Gasaway v. Northwestern Mut. Life Ins. Co., 26 F.3d 957, 960 (9th Cir. 1994). The court may not make credibility determinations, and inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the motion. Masson v. New Yorker Magazine, 501 U.S. 496, 520 (1991); Anderson, 477 U.S. at 249.

The moving party may "move with or without supporting affidavits for a summary judgment in the party's favor upon all or any part thereof." Fed. R. Civ. P. 56(a). "Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed. R. Civ. P. 56(e).

DISCUSSION

I.    First Amendment Claim

This court considered the viability of plaintiff's First Amendment claim in its order on defendants' motion for judgment on the pleadings. Defendants objected to plaintiff's claim principally based on the lack of a causal connection between plaintiff's protected speech and any adverse employment action. The court found that plaintiff had succeeded in stating a *prima facie* First Amendment violation, noting that plaintiff's resignation and his conversation with internal affairs occurred "virtually simultaneously." The court will now revisit that ruling in light of the more fully developed evidentiary record and in light of a recent Supreme Court decision which limits the scope of speech protected under the First Amendment.

4

A. <u>Retaliation</u>

In order to make out a *prima facie* case of retaliation in violation of the First Amendment, plaintiff must establish three elements.

> [T]o state a claim against a government employer for violation of the First Amendment, an employee must show (1) that he or she engaged in protected speech; (2) that the employer took "adverse employment action"; and (3) that his or her speech was a "substantial or motivating" factor for the adverse employment action.

<u>Coszalter v. City of Salem</u>, 320 F.3d 968, 973 (9th Cir. 2003).

Here, plaintiff provides evidence of two instances of arguably protected speech. The first instance is plaintiff's conversation with his former instructor, Guttormson, during his two-week period of supervision by Mabanag. The second instance is plaintiff's report of the Riders' misconduct to internal affairs on July 4 or 5, 2000.

Defendants argue that the speech at issue in this lawsuit is not protected under the First Amendment because one of plaintiff's job duties was to report misconduct to his superiors. In support of this argument, defendants cite <u>Garcetti v. Ceballos</u>, 126 S. Ct. 1951 (2006), which was decided after oral argument on defendants' motion.

Richard Ceballos, the plaintiff in <u>Garcetti</u>, was a deputy district attorney whose job responsibilities included supervising other prosecutors and making recommendations as to the prosecution of their cases. <u>Id.</u> at 1955. At the request of a defense attorney, Ceballos reviewed a search warrant which was used to obtain critical evidence in a pending criminal case. <u>Id.</u> Ceballos concluded that the warrant contained "serious misrepresentations" and wrote a memorandum recommending dismissal of the case. <u>Id.</u> at 1955–56. His supervisors rejected his recommendation, and the warrant survived a motion to suppress. <u>Id.</u> at 1956. Ceballos claimed that as a result of his recommendation, he was subjected to retaliatory employment actions. <u>Id.</u>

The Supreme Court held that the memorandum was not protected speech under the First Amendment. Although the memorandum addressed matters of public concern, the Court held that Ceballos did not speak as a citizen when writing the memorandum, but rather acted "pursuant to his duties as a calendar deputy": "We hold that when public employees make statements pursuant to

5

their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." Id. at 1960. The Court rooted its holding in concerns about a government employer's ability to manage its employees. "Official communications have official consequences, creating a need for substantive consistency and clarity. Supervisors must ensure that their employees' official communications are accurate, demonstrate sound judgment, and promote the employer's mission." Id.; see also id. at 1961 (finding that the "displacement of managerial discretion by judicial supervision finds no support in our precedents.").

The Court later qualified its apparently categorical exclusion of speech made pursuant to a job duty:

> We thus have no occasion to articulate a comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate. We reject, however, the suggestion that employers can restrict employees' rights by creating excessively broad job descriptions. . . . The proper inquiry is a practical one. Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes.

Id. at 1961–62. As the preceding passage makes clear, an employer's articulation of a "duty," without more, does not eliminate any obligation to comply with the First Amendment. Rather, a court must determine whether the employee is "actually expected to perform" the potentially protected act.

Here, defendants' argument that plaintiff had a duty to report misconduct rests on OPD rules and regulations—materials which the Garcetti Court suggested are not dispositive. The central premise of plaintiff's case is that notwithstanding any official policy of the OPD, the culture of the OPD and the express commands of his direct supervisors established that plaintiff had a duty *not* to report misconduct. Plaintiff has offered a variety of evidence in support of his claim, including plaintiff's experiences at the academy, his interaction with his superiors, his interaction with his peers following his report to internal affairs, and the testimony of Chief Word that plaintiff's career

would have been impaired as a result of his report. Thus a fact issue remains as to whether plaintiff's speech was protected under the First Amendment.

The same facts also rebut defendants' claim that plaintiff has not provided *prima facie* evidence that the department had a custom or policy of condoning retaliation against officers who reported misconduct, as required for establishing municipal liability under Monell v. Department of Social Services, 436 U.S. 658 (1978). See Blair v. City of Pomona, 223 F.3d 1074, 1079 (9th Cir. 2000). As the Ninth Circuit has observed, acts similar to those described by plaintiff can support an inference that the OPD "had the custom of chastising whistleblowers." See id. (finding that evidence of hostility towards the plaintiff could suggest that "those in charge of the Department . . . were aware of the police code of silence"). Here, as well, plaintiff has provided evidence that other members of the department were angered at plaintiff's decision to report the Riders to internal affairs, and that Chief Word recognized that plaintiff's actions may have limited plaintiff's ability to pursue a career with the OPD.

Turning now to the second element of a retaliation claim, plaintiff identifies only two adverse employment actions. First, plaintiff notes Vazquez's threat to harm plaintiff in the event that he reported any misconduct to supervisors. As the court has already observed, this threat would tend to discourage plaintiff from exercising his First Amendment rights, and thus qualifies as an adverse employment action under Coszalter. See 320 F.3d at 976. Second, plaintiff provides evidence that his work environment was so intolerable as to render his resignation a constructive discharge. As discussed in more detail below, the evidence offered in opposition to defendants' motion is sufficient to support a constructive discharge claim. Thus plaintiff has provided evidence of an adverse employment action.

Plaintiff's retaliation claim fails with respect to the third element of the Coszalter standard, "that [plaintiff's] speech was a 'substantial or motivating' factor for the adverse employment action." See id. at 973. This element requires that there be some causal connection between an act of protected speech and a retaliatory adverse employment action. See id. at 977 (proving a First Amendment violation requires that the "jury logically could infer that the plaintiff was terminated in

7

retaliation for his speech."). Under the present record, which was not available at the time of this court's previous order, it is clear that plaintiff has failed to establish any causal relationship between his speech and either of the two claimed adverse actions.

With respect to Vazquez's threat, the undisputed record reflects that the threat took place at the beginning of plaintiff's service under Mabanag, days or weeks before plaintiff engaged in either act of protected speech. Thus it cannot be said that plaintiff's speech motivated Vazquez to make his threat.

With respect to the constructive discharge, plaintiff's claim is necessarily based on facts arising on or before July 3, 2000—the date he offered his resignation. On the now-clarified record, this resignation took place one to two days prior to plaintiff's conversation with internal affairs. Thus any actions taken in response to plaintiff's conversation with internal affairs cannot have had an effect on his already-offered resignation (and, by extension, his constructive discharge).

Plaintiff's conversation with Guttormson, in contrast, took place prior to his resignation. According to plaintiff's own evidence and arguments, however, neither Guttormson nor plaintiff mentioned their conversation to anybody. There is absolutely no indication on the record that any of the individuals who contributed to plaintiff's allegedly intolerable working conditions were acting in retaliation against plaintiff's protected speech.

The court's conclusion that plaintiff has not succeeded in creating a triable issue as to retaliation does not end the First Amendment inquiry, as plaintiff argues in the alternative that the policy of the OPD to punish officers who report misconduct is actionable as a prior restraint. The court now turns to that contention.

B.   Prior Restraint

The parties agree that a prior restraint on speech, as well as an act of retaliation, can serve as the basis for a First Amendment claim by an employee against a government employer. See, e.g., United States v. National Treasury Employees Union, 513 U.S. 454, 466–67 (1995) (applying the standard set forth in Pickering v. Board of Educ. of Township High Sch. Dist., 391 U.S. 563 (1968)

8

1 to a restriction on the right of government employees to accept honoraria for speeches given at
2 private functions). Defendants argue, however, that only "administrative and judicial orders
3 forbidding certain communications when issued in advance of the time that such communications
4 are to occur" are actionable as prior restraints. See Alexander v. United States, 509 U.S. 544, 550
5 (1993). According to defendants, the alleged informal and uncodified practice within the OPD of
6 retaliating against officers who report misconduct is not an "administrative . . . order" and is
7 therefore not actionable.

8 In Alexander, a plaintiff who was previously convicted on multiple obscenity and RICO
9 counts sought to prevent the forfeiture of his business assets on the grounds that the loss of his
10 business would prevent him from engaging in constitutionally protected speech. Id. at 548–49. The
11 Supreme Court disagreed, noting that the forfeiture was a penalty for past illegal conduct, and did
12 not purport to enjoin the plaintiff from engaging in any future activities: "Assuming, of course, that
13 he has sufficient untainted assets to open new stores, restock his inventory, and hire staff, petitioner
14 can go back into the adult entertainment business tomorrow, and sell as many sexually explicit
15 magazines and videotapes as he likes, without any risk of being held in contempt for violating a
16 court order." Id. at 551. Alexander thus held only that the challenged restraint must forbid future
17 conduct, and did not consider the types of administrative or judicial acts which might be viewed as
18 prior restraints.

19 Here, based on the facts offered by plaintiff, despite the existence of official policies
20 requiring officers to report misconduct, the OPD in fact tolerated significant hostility to
21 whistleblowers such as plaintiff. The fact that the alleged practice is not pursuant to a written policy
22 is not relevant; it is sufficient to establish that it was tacitly condoned by management. Thus,
23 plaintiff has provided evidence of a prior restraint sufficient to defeat defendants' motion for
24 summary judgment.

## II. Constructive Discharge

Defendants renew their challenge to plaintiff's constructive discharge claim on three grounds. First, defendants claim that plaintiff's supervisor did not have actual notice of the allegedly intolerable conditions. Second, defendants argue that plaintiff did not provide defendants with an opportunity to correct the conditions before resigning, but instead "quit and sued." Third, defendants argue that the threats plaintiff received prior to resignation are not sufficiently intolerable to support a constructive discharge claim. Defendants do not take issue with the accuracy of the facts put forward by plaintiff, or identify portions of plaintiff's pleadings which are unsupported by admissible evidence. Rather, defendants argue that the facts as alleged and supported are insufficient to establish the elements of a constructive discharge.

With respect to the first and second arguments, the court has already concluded that there is no clearly established notice-and-opportunity-to-correct requirement under California law, and that plaintiff's direct supervisors—including Mabanag—are arguably members of management for the purposes of constructive discharge law as laid out by this Circuit. With respect to the third argument, the court has already noted that plaintiff's witnessing of the Riders' illegal acts, coupled with Vazquez's explicit threat, arguably rise to the level of intolerable conditions required for a constructive discharge to occur. See generally Batt v. City of Oakland, No. 02–04975, slip op. at 9–12 (N.D. Cal. Nov. 24, 2003). Defendants' attempt to reargue the same points in moving for summary judgment is unavailing.

## III. Emotional Distress Claims

Defendants argue that plaintiff's emotional distress claims must fail for two reasons. First, defendants argue that plaintiff must demonstrate that defendants violated a mandatory statutory duty in order to recover for infliction of emotional distress. Defendants' argument is based on Haggis v. City of Los Angeles, 22 Cal. 4th 490, 498–99 (2000), which considered a lawsuit under California Government Code section 815.6. Section 815.6 provides that "Where a public entity is under a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular

kind of injury, the public entity is liable for an injury of that kind proximately caused by its failure to discharge the duty unless the public entity establishes that it exercised reasonable diligence to discharge the duty." This statute is inapplicable to plaintiff's claims for infliction of emotional distress, which are based on principles of *respondeat superior* as codified in Government Code section 815.2(a). See § 815.2(a) ("A public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative."). Section 815.6, in contrast, creates primary liability for a municipality's failure to carry out a statutory command.

Second, defendants argue that the facts as alleged and supported by evidence do not evince "extreme and outrageous conduct." As discussed above in connection with plaintiff's constructive discharge claim and in the court's previous order, a jury could reasonably conclude that the Riders' requirement that plaintiff witness and participate in illegal acts, coupled with Vazquez's explicit threat, were outrageous. See Batt, No. 02-04975, slip op. at 15–16. Defendants' motion with respect to plaintiff's claims of emotional distress is therefore denied.

CONCLUSION

For the foregoing reasons, the court hereby DENIES defendants' motion for summary judgment.

IT IS SO ORDERED.

Dated: July 12, 2006

MARILYN HALL PATEL
District Judge
United States District Court
Northern District of California

11